# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| BRANDON T. BUCHANAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10-1237 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

This matter is now before the Court on Plaintiff's Motion for Summary Judgment and the Commissioner's Motion for Summary Affirmance. For the reasons set forth below, Plaintiff's Motion for Summary Judgment [#9] is DENIED, and the Commissioner's Motion for Summary Affirmance [#11] is GRANTED.

### BACKGROUND

Plaintiff, Brandon Buchanan ("Buchanan"), was 21 years old at the time of his administrative hearing. (R30) He is single with no children and lives with his dad. Id. He was home-schooled through high school and studied network systems in junior college for two years until the fall of 2008, but did not graduate. (R33) He did not receive any accommodations in college and drove himself to and from school. (R33-34) He has a valid Illinois driver's license and also drove himself an estimated thirty miles to the hearing. (R31) Buchanan has no relevant past work experience and was looking for employment at the time of the hearing. (R23, 31)

Buchanan claims he is disabled due to Scheuermann's kyphosis and Charcot-Marie-Tooth disease. (R23) He testified that he has had multiple foot surgeries and weakened hand muscles that limit his motor skills. (R24, 25) He estimated he could not stand in place for over five minutes or sit for less than a minute before having to shift positions. (R25-27) On June 29, 2006, Buchanan applied for supplemental security income ("SSI"), alleging disability that began on May 17, 2006. The claim was denied both initially and upon reconsideration. Buchanan requested a hearing and appeared before Administrative Law Judge ("ALJ") Peter Caras on June 11, 2009. A vocational expert ("VE"), Michelle Peters also appeared and testified.

At the time of the hearing, Buchanan was not taking any prescription pain medication and testified that he took over-the-counter pain medication as needed. (R30) He had not recently seen a doctor or chiropractor as he testified he has been uninsured since January 1, 2009. (R28) Buchanan explained that his typical day consisted of watching television and playing games or browsing the internet on his computer while sitting in a reclining chair with his feet elevated to hip level. Id. He testified that he no longer socializes with friends or engages in outdoor activity like camping or fishing. (R32)

The ALJ posed a hypothetical question to the VE:

> Q: Ok. Sedentary work; no ladders, ropes, scaffolds; avoid concentrated exposure to unprotected heights, unprotected hazardous machinery; otherwise occasional climbing, balancing, stooping, kneeling, crouching and crawling; alternate sit/stand every 30 minutes; mild or slight limitation with regards to fine and gross manipulation; and because of pain, let's look at attention or concentration of unskilled work. And I don't know if there's really much in the way of past work, is there?
>
> A: No
>
> Q: Okay. So what exists with that hypothetical claimant at sedentary?

A: Yes, Your Honor. There would be order clerking types of positions, Your Honor. Given that hypothetical in the region, it would be approximately that of 1,000 positions. There would be information clerking types of positions, Your Honor, in which there would be that of approximately that of 950 positions, as well as inspection types of positions, Your Honor, given that hypothetical of approximately that of 900 positions.

Q: All right. What about nationally, what kind of numbers will we be talking about –

. . .

A: On a statewide basis, for the order clerking position, you're looking at approximately that of 28,000 positions, Your Honor; the information clerking of approximately that of 25,000 positions, Your Honor; and the inspection position, on a statewide basis, is approximately that of 22,000 positions.

(R34-35)

Buchanan's attorney then asked the following questions:

Q: Ma'am, if I was to leave the hypothetical the same, but while seated add that the individual has to have their legs elevated to hip level?

A: It would eliminate all substantial gainful activity.

Q: Okay. And – thank you. And, if I was to ask you a hypothetical based on Exhibit 36F, a lower extremity questionnaire completed by Dr. Perona, describing a person who could sit two hours in an eight-hour workday; stand zero to one hours in an eight-hour workday; never lift more than five pounds; and would miss three or more days of work per month, are there any jobs that could accommodate that RFC?

A: Well, first and foremost, the individual doesn't have the ability to sit, stand and walk for a total of eight hours in the, the workday so, therefore, there'd be no work based on that.

(R35-36)

In a decision issued on July 23, 2009, the ALJ determined that Buchanan has severe impairments of Scheuermann's kyphosis and Charcot-Marie-Tooth disease, and does not have an impairment or combination of impairments listed in or medically equivalent to a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. (R14) The

3

ALJ found that Buchanan's medically determinable impairments could reasonably be expected to produce his alleged symptoms. (R17) However, upon consideration of the medical evidence in the record and relevant credibility factors, the ALJ determined that Buchanan retained the residual functional capacity ("RFC") to perform sedentary work, with the exception of occasional climbing, balancing, stooping, kneeling, crouching, and crawling; avoidance of climbing of ladders, ropes, scaffolds, exposure to unprotected heights and hazardous machinery; a limitation to unskilled work with an alternate sit/stand option every thirty minutes and a mild/slight limitation of fine/gross manipulation. (R14)

Given Buchanan's lack of visible discomfort during the administrative hearing and his testimony as to his ability to independently carry out daily activities, the ALJ found that Buchanan's statements regarding the intensity, persistence, and limiting effects of his symptoms were not credible and inconsistent with his RFC assessment. (R17) Taking into account Buchanan's RFC, age, education, and lack of past relevant work experience, the ALJ concluded from VE testimony that Buchanan was not under a disability as defined under the Social Security Act as of the application filing date[1] and that he could still make a successful adjustment to other employment existing in significant numbers in the national economy. (R18) Namely he could work as an order clerk, information clerk, or inspector. (R19)

Buchanan submitted a Request for Review of the ALJ's decision to the Appeals Council on August 4, 2009. (R6) On June 4, 2010, the Appeals Council denied the request, making the ALJ's decision the final act of the Commissioner. (R1-3) This

---

[1] The onset of alleged symptoms is effectively the date of the application.

appeal followed. The Court has jurisdiction over this action pursuant to 42 U.S.C. §405(g).

## DISCUSSION

In order to be entitled to SSI, a plaintiff must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits. *See* 20 C.F.R. §§ 404.1566, 416.966 (1986).

The establishment of disability under the Act is a two-step process. First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382(c)(a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. McNeil v. Califano, 614 F.2d 142, 143 (7th Cir. 1980). That factual determination is made by using a five-step test. *See* 20 C.F.R. §§ 404.1520, 416.920.

The five-step test is examined by the ALJ, in order, as follows: (1) is the plaintiff presently unemployed; (2) is the plaintiff's impairment "severe" (20 C.F.R. §§ 404.1521, 416.921); (3) does the impairment meet or exceed one of the list of specified impairments (20 C.F.R. Part 404, Subpart P, Appendix 1); (4) is the plaintiff unable to perform his or her former occupation; and (5) is the plaintiff unable to perform any other work within the national economy?

An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point,

5

other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. Garfield v. Schweiker, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. Tom v. Heckler, 779 F.2d 1250 (7th Cir. 1985); Halvorsen v. Heckler, 743 F.2d 1221 (7th Cir. 1984).

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's finding with the Court's own assessment of the evidence. Pugh v. Bowen, 870 F.2d 1271 (7th Cir. 1989). The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971). Credibility determinations made by the ALJ will not be disturbed unless the finding is clearly erroneous. Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504 (1985); Imani v. Heckler, 797 F.2d 508 (7th Cir.), *cert. denied*, 479 U.S. 988, 107 S.Ct. 580 (1986).

Buchanan raises three claims in his appeal: (1) the ALJ erred by discounting the opinions of the treating physicians and ignoring an entire line of contrary evidence; (2) the ALJ placed undue reliance upon Buchanan's daily activities and observation of his behavior at the hearing to find his subjective limitations not credible; and (3) the

6

vocational testimony was flawed because the ALJ's hypothetical did not include all of Buchanan's limitations.

Buchanan argues that the ALJ disregarded a whole line of contrary evidence and erroneously rejected the opinions of treating physicians. (R11-12) The Seventh Circuit has recognized that the ALJ is not bound to a treating physician's opinion. See, eg., Elder v. Astrue, 529 F.3d 408, 415 (7th Cir. 2008). Under the "treating physician" rule, the Commissioner will not give controlling weight to the treating physician's opinion on the nature and severity of the claimant's impairments unless that opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with other substantial evidence." 20 C.F.R. § 416.927(d)(2); Hofslien v. Barnhart, 439 F.3d 375, 377 (7th Cir. 2006). In addition, the ALJ, as the trier of fact, must take into account a treating physician's possible bias. See Hofslien, 439 F.3d at 377 (noting "the fact that the claimant is the treating physician's patient . . . detracts from the weight of that physician's testimony, since, as is well known, many physicians . . . will often bend over backwards to assist a patient in obtaining benefits") (internal citations omitted). Ultimately, it is the ALJ's responsibility to decide whether to believe the opinion of "the treating physician who has experience and knowledge of the case, but may be biased, or that of the consulting physician, who may bring expertise and knowledge of similar cases – subject only to the requirement that the ALJ's decision be supported by substantial evidence." Micus v. Bowen, 979 F.2d 602, 609 (7th Cir. 2009).

Where there is conflicting evidence from medical experts, it is up to the ALJ to decide which doctor to believe. Young v. Barnhart, 362 F.3d 995, 1001 (7th Cir. 2004). The mere existence of an evidentiary conflict does not provide sufficient grounds to

reverse the ALJ's decision.  Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000). However, the ALJ must articulate his reasons for rejecting one version of facts in favor of another.  Young v. Secretary of Health and Human Services, 957 F.2d 386, 393 (7th Cir. 1992).

Buchanan argues that the ALJ should have given controlling weight to the opinions of two treating physicians, Dr. Paul Perona and Dr. Robert Mestan, resulting in a finding of disability.  At the request of his primary physician, Robert Mestan, M.D., Buchanan was seen by neurologist Jai Kumar, M.D., who first diagnosed him with Charcot-Marie-Tooth disease on February 18, 2003.  (R304) Buchanan stated that since October 2002, he often tripped and fell while walking, had some difficulty writing, and experienced low back pain.  Id.  Dr. Kumar observed mild weakness of the hand muscles bilaterally, grade 3 foot muscle strength for dorsiflexion and plantar flexion, decreased vibration sense in both feet, and difficulty walking due to bilateral foot drop.  (R304-05) He recommended that Buchanan be fitted for foot braces to assist with his balance and prevent falls.  (R305) During the follow-up appointment on August 17, 2004, Dr. Kumar observed mild weakness and wasting of hand and feet muscles.  (R302)

On January 12, 2005, Michael Pinzur, M.D. performed a tri-plane osteotomy, calcaneal osteotomy, posterior tibial tendon transfer, and heel cord lengthening surgery on Buchanan's left foot.  (R307) In a follow-up visit on October 7, 2005, Dr. Pinzur noted that Buchanan "has a very good result" and that his left foot was "all-in-all pretty good."  (R430) On December 28, 2005, Dr. Pinzur then performed a tri-plane osteotomy, anterior tibialis tendon transfer, and first metatarsal osteotomy on Buchanan's right foot. (R309) Dr. Pinzur noted on May 12, 2006 that Buchanan's repositioned bone structure

was in "excellent position" and that he was able to walk without a brace despite some discomfort by his ankle. (R428)

Orthopedist Paul Perona, M.D., evaluated Buchanan for upper and lower back pain on August 8, 2006. (R402) Dr. Perona noted that Buchanan's pelvis was straight and could not produce any pain with percussion of the spine. Id. He found that Buchanan had some slight increased kyphosis when he sat and proceeded to order physical therapy for strengthening exercises. Id. Progress notes indicated that after beginning physical therapy, Buchanan reported a decrease in his back pain. (R422) By August 29, 2006, physical therapist Cindy Behrends reported that Buchanan's "back pain improved to the point where he is no longer having any." (R423)

On August 25, 2006, neurologist Christopher Zallek, M.D., evaluated Buchanan, noting that Buchanan had intrinsic hand weakness, musculoskeletal changes at his ankles, and normal coordination maneuvers except as limited by weakness. (R404) Dr. Zallek diagnosed progressive Charcot-Marie-Tooth disease with further impaired function of the hands and ankles. (R405)

State agency physician Frank Norbury, M.D., completed an RFC assessment of Buchanan on September 7, 2006. (R438) Dr. Norbury found that Buchanan could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, and sit, stand, and/or walk with normal breaks in between for about 6 hours in an 8-hour workday. (R439) Additionally, Dr. Norbury found that Buchanan could frequently balance, stoop, kneel, crouch, and crawl, and occasionally climb ramps, stairs, ladders, ropes, and scaffolds. Id. Dr. Norbury also stated that with the help of physical therapy, Buchanan's back pain has improved.

On October 26, 2006, Dr. Perona saw Buchanan for a follow-up appointment. (R466) Dr. Perona found that Buchanan had severe left foot heel cord tightness, loss of active foot eversion with foot pronation, and Scheuermann's kyphosis. Id. He suggested that Buchanan see Dr. Pinzur again regarding a possible repeat osteotomy procedure, tendon transfer, and heel cord lengthening of the left foot. Id. Dr. Perona additionally noted, "I feel quite sorry for this patient, given the fact that he is struggling as far as school and I do not feel that he is capable of working, because of his limitations of standing and sitting." Id. He also stated that he told Buchanan's family that he would be "more than happy to help in any way that [he] can" and planned to refer Buchanan to his father, an attorney, for possible guidance in obtaining social security disability. Id.

On January 17, 2007, Phillip Budzenski, M.D., performed a consultative examination in which he confirmed Buchanan's diagnosis of Charcot-Marie-Tooth disease. (R498) Dr. Budzenski found that in regard to the workplace, Buchanan could perform very light work with his upper body for brief periods of time and not at a rapid rate. (R488) At the time, Buchanan was wearing braces on both feet, as he had just undergone a left foot osteotomy and had hardware removed from his right foot. (R484) Dr. Budzenski determined that Buchanan did not have muscle atrophy in the hands and that his grip strength was normal at 5 out of 5 bilaterally. (R487)

State agency physician Virgilio Pilapil, M.D., completed an RFC assessment of Buchanan on February 7, 2007. (R489) Dr. Pilapil found that Buchanan could occasionally lift and/or carry 10 pounds, frequently lift and/or carry less than 10 pounds, stand and/or walk with normal breaks in between for at least 2 hours in an 8-hour workday, and sit for a total of about 6 hours in an 8-hour workday. (R490) Regarding

postural limitations, Dr. Pilapil determined that Buchanan could occasionally stoop, kneel, crawl, and climb ramps and stairs, while he could never balance, crouch, or climb ladders, ropes, and scaffolds. (R491) Dr. Pilapil stated that Buchanan should avoid all exposure to hazards such as machinery and heights. (R493) The assessment revealed no muscle atrophy in either hand and a grip strength of 5 out of 5 bilaterally. (R492)

On March 1, 2007, Dr. Perona saw Buchanan for a follow-up visit. (R526) He noted that Buchanan had difficulty ambulating and tenderness in the mid-thoracic region. Id. Dr. Perona ordered Buchanan to continue physical therapy for back pain and Scheuermann's kyphosis. (R501) That day, Dr. Perona wrote a letter to Buchanan's counsel stating his opinion that Buchanan is not "capable of returning to work doing a normal job, because of his neuromuscular limitations." Id. On March 30, 2007, physical therapist Cindy Behrends discharged Buchanan from her care, reporting that Buchanan denied having any back pain and could continue with his home exercise program. Id.

In a lower extremities impairment questionnaire completed for Buchanan's counsel on May 15, 2007, Dr. Perona indicated that in an 8-hour day, Buchanan could only sit, stand, or walk between 0 and 1 hours. (R529) He opined that Buchanan could never lift or carry any amount of weight and that he was incapable of tolerating "even 'low [work] stress.'" (R530-31) Dr. Perona also noted that Buchanan could regularly carry out activities of daily living independently without assistance. (R529)

On August 21, 2007, Dr. Zallek completed a follow-up examination in which he noted that Buchanan's ambulation improved after his 2006 foot surgery. (R537) Dr. Zallek indicated that Buchanan needed longer lasting durable orthotic devices and recommended annual follow-up visits. Id.

Dr. Perona submitted a second lower extremities impairment questionnaire to Buchanan's counsel on October 1, 2007. (R541) He opined that in an 8-hour day, Buchanan could sit for 2 hours though not consistently, an increase from the 0-1 hours indicated in the May 2007 questionnaire. (R544) He did not identify the amount of weight that Buchanan could lift or carry. (R545) Dr. Perona stated that Buchanan's symptoms were severe enough to frequently interfere with his ability to concentrate and opined that they would last a lifetime. (R546)

On April 9, 2008, Dr. Mestan, Buchanan's primary care physician, completed a multiple impairment questionnaire in which he indicated that Buchanan's pain was an 8 out of 10, with 10 being the most severe. (R559) Dr. Mestan stated that standing longer than 5 minutes could trigger such pain and that Buchanan must get up and move around every 30-45 minutes. Id. Additionally, Dr. Mestan stated that Buchanan would not be completely precluded from engaging in an 8-hour workday although he would be moderately limited in terms of the use of his fingers, hands, and arms for overhead reaching as well as grasping, turning, and twisting objects. (R560) Buchanan would also not be able to kneel, bend, or stoop. (R563) Dr. Mestan further noted that Buchanan could frequently lift and carry 5-10 pounds, occasionally lift and carry 10-20 pounds, and never lift or carry 20-50 pounds. Id.

Contrary to Buchanan's suggestion, the ALJ's conclusion that Dr. Perona and Dr. Mestan's opinions indicating a less-than-sedentary physical RFC are not entitled to controlling weight is supported by substantial evidence. Dr. Perona stated in his questionnaire responses to Buchanan's counsel that Buchanan could not sit, stand, or walk more than 1 hour (later revised to 2 hours for sitting) in an 8-hour day and that he

12

could never lift or carry any weight at all. (R529-30) Dr. Perona also stated on two occasions his general opinion that Buchanan could not work. (R466, 501) Addressing Dr. Perona's opinions, the ALJ found that they are "not supported by the negative examination signs and findings in the physician's examination notes." (R18)

Nowhere in Dr. Perona's treatment notes does he mention that Buchanan could not lift any amount of weight or that he was severely limited in his ability to sit, stand, or walk. Furthermore, other medical sources do not align with Dr. Perona's assessment that Buchanan was virtually disabled. Namely, Dr. Mestan stated in his questionnaire that Buchanan could frequently lift and/or carry 5-10 pounds and occasionally lift and/or carry 10-20 pounds, whereas Dr. Perona stated that Buchanan could never lift or carry a single pound. (R563) Dr. Mestan's assessment was supported by state agency physician Dr. Pilapil, who indicated that Buchanan could occasionally lift and/or carry 10 pounds, and frequently lift and/or carry less than 10 pounds. (R490) After both of Buchanan's surgeries on his feet, Dr. Pinzur noted that Buchanan was able to walk without a brace and that his repositioned bone structure was "excellent." (R428) Progress notes also indicated that Buchanan denied having any back pain and could be discharged from physical therapy. (R423, 501)

The ALJ's rejection of the portion of Dr. Mestan's opinion stating that Buchanan was limited to moderate overhead reaching and restricted from kneeling, bending, or stooping is supported by substantial evidence. (R560, 563) The ALJ instead adopted the position that Buchanan did not have any reaching limitations and could occasionally kneel, bend, and stoop. (R14) This conclusion is supported by state agency physicians Dr. Norbury and Dr. Pilapil. (R439, 491) Dr. Norbury even found that Buchanan could

13

frequently, as opposed to occasionally, kneel, bend, and stoop. (R439) Dr. Mestan did not provide any treatment notes in which he mentioned a basis for limiting Buchanan to moderate overhead reaching, and no records from other physicians mention problems with Buchanan's ability to reach.

Buchanan also claimed that the ALJ should have mentioned and considered Dr. Pinzur's November 20, 2006 letter to the Administration in which Dr. Pinzur expressed his doubt that Buchanan would "be able to do any substantial physical demanding work for at least a year." (R482) However, this letter would not have impacted the ALJ's final decision. Insofar as it can be interpreted as a conclusion of disability, the letter should not be considered at all, as the ultimate finding of disability is specifically reserved to the Commissioner under 20 CFR 404.1427(e) and SSR 96-5p. Even if Dr. Pinzur did not make a conclusion of disability, his statement that Buchanan could not do "substantial physical demanding work" is consistent with the ALJ's determination that Buchanan was restricted to certain sedentary work.

Ultimately, the ALJ's decision to discount the aforementioned opinions of Dr. Perona and Dr. Mestan was supported by substantial evidence from the record as a whole. Thus, the ALJ did not erroneously reject these treating physicians' opinions.

Secondly, Buchanan argues that the ALJ did not properly evaluate his credibility and placed too much emphasis on his account of his daily activities and behavior at the hearing. However, the ALJ's finding of credibility should not be disturbed unless it is clearly erroneous. See Skarbek v. Barnhart, 390 F.3d 500, 505 (7th Cir. 2004) ("This court will affirm a credibility determination as long as the ALJ gives specific reasons that are supported by the record for his finding."). Here, substantial evidence supports the

ALJ's determination that Buchanan's statements concerning the intensity, persistence, and limiting effects of his alleged symptoms are not credible.

The ALJ recognized that Buchanan did not display any evidence of pain or discomfort while testifying at the hearing, and took into account his ability to function without assistance on a daily basis. (R17) The ALJ also noted that Buchanan could independently travel to and from appointments (including the hearing), did not receive any accommodations in his two years of junior college, spent his days watching television and playing games on the computer, and only took over-the-counter pain medication. Id. Reasoning that "[t]hese activities suggest a level of concentration inconsistent with a disabling level of pain," the ALJ's rejected the credibility of Buchanan's allegations of disability. Id. In addition, the ALJ found that Buchanan's testimony contradicted medical findings in the record. Id. The ALJ noted that records indicated that the foot surgeries were successful and that Buchanan was no longer experiencing back pain after physical therapy. (R428, 501) By articulating reasons supported by substantial evidence in the record, the ALJ sufficiently justified his credibility determination. Thus, the ALJ's finding of credibility should remain undisturbed.

Lastly, Buchanan contends that the ALJ's hypothetical to the VE failed to include all of the limitations in the medical record, particularly those given by Dr. Perona and Dr. Mestan that would counsel toward a less-than-sedentary RFC. Because the ALJ's decision to discount Dr. Perona and Dr. Mestan's opinions was supported by substantial evidence, the ALJ's omission of their conclusions in his hypothetical is appropriate. See Schmidt v. Astrue, 496 F.3d 833, 846 (7th Cir. 2007) (finding that "the ALJ is required

ALJ's determination that Buchanan's statements concerning the intensity, persistence, and limiting effects of his alleged symptoms are not credible.

The ALJ recognized that Buchanan did not display any evidence of pain or discomfort while testifying at the hearing, and took into account his ability to function without assistance on a daily basis. (R17) The ALJ also noted that Buchanan could independently travel to and from appointments (including the hearing), did not receive any accommodations in his two years of junior college, spent his days watching television and playing games on the computer, and only took over-the-counter pain medication. Id. Reasoning that "[t]hese activities suggest a level of concentration inconsistent with a disabling level of pain," the ALJ's rejected the credibility of Buchanan's allegations of disability. Id. In addition, the ALJ found that Buchanan's testimony contradicted medical findings in the record. Id. The ALJ noted that records indicated that the foot surgeries were successful and that Buchanan was no longer experiencing back pain after physical therapy. (R428, 501) By articulating reasons supported by substantial evidence in the record, the ALJ sufficiently justified his credibility determination. Thus, the ALJ's finding of credibility should remain undisturbed.

Lastly, Buchanan contends that the ALJ's hypothetical to the VE failed to include all of the limitations in the medical record, particularly those given by Dr. Perona and Dr. Mestan that would counsel toward a less-than-sedentary RFC. Because the ALJ's decision to discount Dr. Perona and Dr. Mestan's opinions was supported by substantial evidence, the ALJ's omission of their conclusions in his hypothetical is appropriate. See Schmidt v. Astrue, 496 F.3d 833, 846 (7th Cir. 2007) (finding that "the ALJ is required

only to incorporate into his hypotheticals those impairments and limitations he accepts as credible"); see also Ehrhart v. Secretary of Health and Human Services, 969 F.2d 534, 540 (7th Cir. 1992) (noting that it is proper for the ALJ to omit from his hypotheticals any limitations based on statements the ALJ found lacking support from the record as a whole). The ALJ's RFC finding based on the hypothetical given is supported by substantial evidence and must be upheld. See Meredith v. Bowen, 833 F.2d 650, 654 (7th Cir. 1987) ("All that is required is that the hypothetical question be supported by the medical evidence in the record.").

## CONCLUSION

For the reasons set forth herein, Plaintiff's Motion for Summary Judgment [#9] is DENIED and the Commissioner's Motion for Summary Affirmance [#11] is GRANTED. This matter is now terminated.

ENTERED this 24th day of June, 2011.

s/ James E. Shadid
James E. Shadid
United States District Judge